1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

8 | BRANCH BANKING AND TRUST          2:11-CV-1366 JCM (CWH)
COMPANY,
9
                    Plaintiff,
10
11   v.
12   DAVID M. FRANK, et al.,
13                   Defendants.
14
15                           **ORDER**

16          Presently before the court is plaintiff Branch Banking & Trust Co.'s motion for summary

17   judgment (doc. # 107). Defendants filed an opposition to plaintiff's motion (doc. # 112) and plaintiff

18   replied (doc. # 117). Also before the court is defendants' motion for summary judgment (doc. # 106).

19   Plaintiff filed an opposition to defendants' motion (doc. # 113) and defendants replied (doc. # 116).

20   **I.     Background**

21          This case arises out of a loan transaction which occurred on or about April 19, 2005 by and

22   between Station Plaza Partners, LLC ("Station Plaza") and Colonial Bank, plaintiff's predecessor-in-

23   interest.[1] Station Plaza requested $29,260,700.00 to purchase and develop approximately 20.16 acres

24   of raw land near the intersection of Lake Mead Blvd. and Rancho Drive in North Las Vegas, Nevada.

25   A deed of trust was executed on the subject property to secure repayment. The loan was evidenced

26

27          [1] In August 2009, Colonial Bank failed and was taken over by the Financial Institutions Division of the State
     of Nevada Department of Business and Industry. The FDIC was appointed as the receiver for Colonial Bank and, on
28   August 14, 2009, plaintiff purchased most of Colonial Bank's assets, including the subject loan, from the FDIC.

James C. Mahan
U.S. District Judge

1   by a promissory note, and each of the defendants in this action individually guaranteed repayment.

2      On or about August 19, 2008, with the consent of Colonial Bank, Station Plaza, and

3   defendants, the maximum amount committed under the loan was reduced to $19,885,000.00. On July

4   23, 2009, Station Plaza defaulted on the loan. As a result, on June 22, 2011, plaintiff declared the

5   entire balance due in accordance with the terms of the loan.

6      Plaintiff initiated this action on August 24, 2011, after neither Station Plaza nor any of the

7   defendants attempted to pay the balance of the loan. On March 23, 2012, a trustee's sale of the

8   property occurred in which plaintiff acquired the property by placing a credit bid of $7.6 million.

9      Plaintiff seeks summary judgment on its claims of breach of contract related to each

10   defendant's individual guaranty under NEV. REV. STAT. § 40.495 or § 40.459.[2] (Doc # 117, 3:13-17).

11   Alternatively, plaintiff seeks partial summary judgment as to defendants' liability and the

12   appointment of an appraiser and a hearing to determine the fair market value of the property at the

13   time of sale, pursuant to NEV. REV. STAT. § 40.457. *Id.*

14      In their motion, defendants claim that plaintiff has failed to present evidence showing the fair

15   market value of the property at the time of the trustee's sale or the amount of consideration that

16   plaintiff paid to acquire the loan, which are necessary elements under NEV. REV. STAT. §

17   40.459(1)(c). (Doc. # 106, 2:24-3:2). Defendants also contend that summary judgment in plaintiff's

18   favor would not be proper because there are genuine issues of material fact relating to the

19   reimbursement that plaintiff has received from the FDIC and defendants' affirmative defenses of

20   recoupment. (Doc # 112, 2:18-3:2).

21   **II.   Legal Standard**

22      The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings,

23   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

24   show that "there is no genuine issue as to any material fact and that the movant is entitled to a

25   judgment as a matter of law." FED. R. CIV. P. 56(a). A principal purpose of summary judgment is "to

26

27      [2] Though plaintiff mentions both of these statutory provisions in its motion, the court has previously ruled that
the relevant statutory provision in this case is NEV. REV. STAT. § 40.459(1)(c). (Doc. 101, 4:15-23). The court declines

28   to revisit its decision here and considers these motions only under the framework of NEV. REV. STAT. §  40.459.

James C. Mahan
U.S. District Judge

1  isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24
2  (1986).

3      In determining summary judgment, a court applies a burden-shifting analysis. "When the
4  party moving for summary judgment would bear the burden of proof at trial, it must come forward
5  with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.
6  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue
7  of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213
8  F.3d 474, 480 (9th Cir. 2000) (citations omitted).

9      In contrast, when the nonmoving party bears the burden of proving the claim or defense, the
10  moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential
11  element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to
12  make a showing sufficient to establish an element essential to that party's case on which that party
13  will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails
14  to meet its initial burden, summary judgment must be denied and the court need not consider the
15  nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

16      If the moving party satisfies its initial burden, the burden then shifts to the opposing party
17  to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith*
18  *Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing
19  party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the
20  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions
21  of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th
22  Cir. 1987).

23      In other words, the nonmoving party cannot avoid summary judgment by relying solely on
24  conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045
25  (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the
26  pleadings and set forth specific facts by producing competent evidence that shows a genuine issue
27  for trial. *See Celotex Corp.*, 477 U.S. at 324.

28

**James C. Mahan**
**U.S. District Judge**

- 3 -

1       Where a moving party's papers are insufficient to support a motion for summary judgment,

2 or reveal a genuine issue of material fact, summary judgment is inappropriate. *Martinez v. Stanford*,

3 323 F.3d 1178, 1182-83 (9th Cir. 2003).

**III.**    **Analysis**

5       Under Nevada law, following a trustee's sale, a creditor is entitled to a deficiency judgment

6 "if it appears from the sheriff's return or the recital of consideration in the trustee's deed that there

7 is a deficiency of the proceeds of the sale and a balance remaining due to the judgment creditor or

8 the beneficiary of the deed of trust, respectively." NEV. REV. STAT. § 40.455(1). This statutory

9 scheme also requires that the court, prior to awarding a deficiency judgment, hold a hearing

10 regarding the fair market value of the property as of the date of the trustee's sale. NEV REV. STAT.

11 § 40.457(1).

12       The arguments in these motions for summary judgment focus on a provision of Nevada law

13 specifically limiting the recovery of parties who acquired the right to obtain a deficiency judgment

14 from a previous holder of the right. In such a case, "[t]he court shall not render judgment for more

15 than . . . the amount by which the amount of the consideration paid for that right exceeds the fair

16 market value of the property sold at the time of sale or the amount for which the property was

17 actually sold, whichever is greater, with interest from the date of sale and reasonable costs." NEV.

18 REV. STAT. § 40.459(1)(c).

19       Defendants allege that plaintiff has not met its burden to provide evidence of (1) the

20 consideration it paid to obtain the right to obtain a judgment under the loan and (2) the fair market

21 value at the time of the sale. (Doc. # 106). Both of these elements are necessary under the statute to

22 prove the amount to which plaintiff would be entitled if it received a judgment in its favor.

23 Defendants further argue that they have put forward affirmative defenses which create a genuine

24 dispute of material fact as to the calculation of indebtedness.

25       Plaintiff contends that it has provided sufficient evidence regarding the issues of

26 consideration and fair market value at the time of sale, and that there are no other genuine issues of

27 material fact, and thus it argues is entitled to summary judgment in its favor.

28

**James C. Mahan**
**U.S. District Judge**

                      - 4 -

*(A) Liability under the Guaranty Agreements*

As a preliminary matter, plaintiff asserts and defendants do not refute that the loan documents and guaranty agreements are valid and enforceable contracts, and that defendants breached these contracts by failing to pay the agreed-upon amount. Similarly, defendants do not dispute plaintiff's standing as the legitimate successor-in-interest to Colonial Bank for the purposes of this loan. Accordingly, the court finds that defendants will be liable to plaintiff for the amount to be determined under § 40.459(1)(c). Therefore the court will grant plaintiff's motion for summary judgment as to the issue of liability.

*(B) Consideration*

Plaintiff argues that the deposition testimony of Thomas Brent Hicks[3] and a redacted schedule 4.15B provide competent evidence of the consideration paid for the right to obtain the judgment under the loan. Defendants argue that both of these pieces of evidence are inadmissible, and even if they are admissible, that they do not establish the amount of consideration.

Defendants contend that the testimony of Mr. Hicks violates the best evidence rule, claiming that his testimony alluded to the contents of documents that were not submitted as evidence. This rule states that "an original writing, recording, or photograph is required in order to prove its content unless the rules or a deferral statute provides otherwise." FED. R. EVID. 1002.

Defendants' argument severely overstates the requirements of rule 1002. This rule requires only that an original document be produced *in order to prove the contents of that document*. Here, Mr. Hicks was testifying as to the amount of consideration that was paid by plaintiff to obtain the loan, not the contents of any unproduced document. The documents Mr. Hicks referenced in his deposition testimony, namely the purchase and assumption agreement and a redacted schedule 4.15B, were made available to defendants during the deposition. Because Mr. Hicks' testimony did not address the contents of any documents that were not made available, the testimony is not rendered inadmissible by FED. R. EVID. 1002.

. . .

---

[3] Mr. Hicks testified as plaintiff's designee pursuant to Fed. R. Civ. P. 30(b)(6).

James C. Mahan
U.S. District Judge

1   Defendants argue that, pursuant to FED. R. CIV. P. 37(c), the court should not consider the
2   schedule 4.15B, because it was not submitted until after the discovery deadline. Indeed the document
3   itself appears to have been first shown to defendants at the time of Mr. Hicks' deposition on
4   December 17, 2012, over two months after the close of discovery. Additionally, the document was
5   not formally produced by plaintiff until December 21, 2012. However, defendants breeze over the
6   fact that Mr. Hicks' deposition was taken at that late date *by the agreement of all of the parties*, and
7   that the schedule and its sole unredacted line of data were made available at that time for the
8   defendants' review.

9   The deposition transcript shows that defendants were able to extensively question Mr. Hicks
10  about every nuance of the single visible line of text in the redacted schedule 4.15B. Thus, because
11  the parties all gave consent to hold Mr. Hicks' deposition on that date, and because the defendants
12  were still able to review the document and question Mr. Hicks about the entirety of its contents, the
13  plaintiff's failure to disclose the schedule 4.15B prior to the discovery deadline was both
14  substantially justified and harmless. The information contained in the document is therefore available
15  as evidence for the purposes of plaintiff's motion for summary judgment.

16  Defendants further argue that Mr. Hicks' testimony is not sufficient to prove the amount of
17  consideration because it is "uncertain," "unclear," and "speculative." (Doc. # 112, 23:22-25). Nevada
18  requires that damages be proved by "substantial evidence . . . as the law does not permit arriving at
19  such amount by conjecture." *Cathcart v. Robison, Lyle, Belaustegui, & Robb*, 795 P.2d 986, 987
20  (Nev. 1990).

21  Far from simply "tossing out a number," Mr. Hicks identified a specific amount that plaintiff
22  paid the FDIC for the loan and also walked through several passages in the supporting documents
23  that substantiate his assertion. He testified that the purchase and assumption agreement clearly states
24  that all loans that plaintiff obtained from the FDIC were acquired at "book value." (Doc. # 117-2,
25  36:21-25); *see* (doc. # 117-3, 50).

26  He then read from the agreement where it indicates that "[b]ook value means, with respect
27  to any [a]sset and any [l]iability [a]ssumed, the dollar amount thereof stated on the [a]ccounting
28

James C. Mahan
U.S. District Judge

- 6 -

1   [r]ecords of the [f]ailed [b]ank." (Doc. # 117-2, 43:2-8); (doc. # 117-3, 2). Subsequently, Mr. Hicks

2   turned to the redacted 4.15B schedule, which states that the balance of the loan was $19,375,448.45

3   when it was acquired. (Doc. # 117-3, 129).

4          Certainly, Mr. Hicks' testimony amounts to more than mere conjecture regarding the amount

5   plaintiff paid for the loan. Thus, considering the thoroughness with which Mr Hicks' deposition

6   testimony and the documentary evidence speak to the issue, the court finds that plaintiff has made

7   a showing sufficient to establish that it paid $19,375,448.45 as consideration to acquire the right to

8   obtain a judgment on the loan.

9   *(C) Fair Market Value at the Time of Sale*

10          Defendants claim that plaintiff has not provided evidence as to the fair market value of the

11   property at the time of the trustee's sale. Plaintiff argues that the credit bid it submitted at the

12   trustee's sale to acquire the property is sufficient evidence to establish the fair market value.

13          As a preliminary matter, it is important to note that NEV. REV. STAT. § 40.457(1) requires

14   the court to hold a hearing and take evidence specifically relating to the fair market value as of the

15   date of the trustee's sale before it can award a deficiency judgment. Thus, the statutory scheme

16   requires the plaintiff to provide evidence of the issue before requesting such a hearing. Nonetheless,

17   the court finds that the credit bid is sufficient to establish prima facie proof of fair market value at

18   the time of the trustee's sale.

19          Under Nevada law, "[f]air market value is generally defined as the price which a purchaser,

20   willing but not obliged to buy, would pay an owner willing but not obliged to sell, taking into

21   consideration all the uses to which the property is adapted and might in reason be applied. *Unruh*

22   *v. Streight*, 615 P.2d 247, 249 (Nev. 1980). In cases such as this one that do not include a willing

23   buyer and a willing seller, the sale price is not necessarily an indication of a property's fair market

24   value. *See Halfon v. Title Ins. & Trust Co.*, 634 P.2d 660, 661 (Nev. 1981). However, the court can

25   "properly consider all relevant evidence in determining the value of the property." *Unruh*, 615 P.2d

26   at 249; *Tahoe Highlander v. Westside Fed. Sav.*, 588 P.2d 1022, 1024 (Nev. 1979). In order to

27   properly support a calculation of fair market value, a party must provide evidence "which a

28

James C. Mahan
U.S. District Judge

1    reasonable mind might accept as adequate to support [its] conclusion." *See State, Emp. Security v.*

2    *Hilton Hotels*, 729 P.2d 497, 498 (Nev. 1986).

3        It is well settled under Nevada law that an owner can be competent to testify as to the value

4    of his own real property. *See State ex rel. Dep't of Highways v. Olsen*, 351 P.2d 186, 188-89 (Nev.

5    1960); *State ex rel. Dep't of Highways v. Campbell*, 388 P.2d 733, 737 (Nev. 1964). In *Olsen*, the

6    court found that the testimony of an individual who had owned a property for ten years, owned other

7    properties in the city, knew the values of nearby properties, and was aware of recent sale prices of

8    comparable properties, provided sufficient evidence by itself to determine the property's fair market

9    value. *See* 351 P.2d at 188-89.

10        Plaintiff has provided evidence indicating that, for property of this type, it follows an

11    established policy of obtaining two independent appraisals within five months of the trustee's sale

12    and placing a credit bid for no more than 80% of the mean value of those appraisals. (Doc # 113-7,

13    25:24-26:4, 51:24-52:6, 58:1-18). Following this process, plaintiff concluded that the value of the

14    property was $9,500,000 and placed its credit bid for 7,600,000. (Doc # 113-7, 65:12-25); (doc. #

15    107-22, 38).

16        The evidence provided by plaintiff certainly meets the substantial evidence standard.

17    Plaintiff's thorough process for calculating its credit bid entails a comprehensive assessment of the

18    value of the property that it seeks to bid upon. In this case, its two independent appraisals led to a

19    determination that the property was worth $9,500,000. Because plaintiff has a credible basis for its

20    valuation of the property, it, like the property owner in *Olsen*, has "provided evidence which a

21    reasonable mind might accept as adequate" to determine fair market value. Therefore plaintiff has

22    made a sufficient showing to establish the fair market value of the property at the time of the

23    trustee's sale.

24        Although plaintiff has provided sufficient evidence regarding this element, NEV. REV. STAT.

25    § 40.457(1) requires that, before awarding a deficiency judgment, the court must "hold a hearing and

26    shall take evidence presented by either party concerning the fair market value of the property sold

27    as of the date of foreclosure sale or trustee's sale." As no such hearing has been held in this case, the

28

**James C. Mahan**
**U.S. District Judge**

- 8 -

1   court cannot presently determine the value of a deficiency judgment to be awarded to plaintiff.

2   *(D) Amount of Indebtedness*

3   Defendants argue that there is a genuine issue of material fact as to the "amount of

4   indebtedness" involved in this case. For this type of deficiency judgment, "the 'amount of the

5   indebtedness' does not include any amount received by, or payable to, the judgment creditor or

6   beneficiary of the deed of trust pursuant to an insurance policy to compensate the judgment creditor

7   or beneficiary for any losses incurred with respect to the property or the default on the debt." NEV.

8   REV. STAT. § 40.459(2).

9   Defendants claim that the "shared loss agreement" between plaintiff and the FDIC qualifies

10  as an "insurance policy" under §  40.459(2), and that any compensation given to plaintiff by the

11  FDIC under the agreement would directly reduce the amount that plaintiff could receive in a

12  deficiency judgment. The court disagrees.

13  Under the shared-loss agreement, the FDIC is obligated to compensate plaintiff for a

14  percentage of any portion of the loan that plaintiff is unable to collect from defendants after

15  exercising its best efforts to do so. However, plaintiff is obligated to refund the FDIC if it

16  subsequently recovers all or part of the outstanding balance on the loan from defendants.

17  Though the legislative history regarding § 40.459(2) is extremely sparse, the statutory scheme

18  regarding deficiency judgment, as a whole, is understood as being built to prevent unjustified

19  windfalls. This is intent is evident in provisions such as the "one-action rule" codified in NEV. REV.

20  STAT. § 40.430 which seeks to prevent creditors from receiving a "double recovery" by obtaining

21  both the secured property and a judgment against the debtor for the full amount of the debt. *See*

22  *Walters v. Eighth Judicial Dist. Court of State ex rel. Cnty. of Clark*, 263 P.3d 231, 235 (Nev. 2011).

23  Similarly, the statutory scheme prevents creditors from acquiring secured property at an artificially

24  deflated price in order to increase the amount of a deficiency judgment in its favor. *First Interstate*

25  *Bank of Nevada v. Shields*, 730 P.2d 429, 431 (Nev. 1986).

26  In the same manner, the limitation within § 40.459(2) seeks to prevent creditors from

27  obtaining a windfall by receiving both a payment for the outstanding balance under an insurance

28

James C. Mahan
U.S. District Judge

- 9 -

1    policy and a judgment for the full sum against the debtor. Considering this purpose, it is clear that

2    this provision does not apply to the shared loss agreement between plaintiff and the FDIC.

3          The fact that plaintiff must refund the FDIC based on the amount that it is able to collect

4    from defendants means that there is no possibility that plaintiff will receive double-recovery on this

5    loan. Thus the statutory intent of § 40.459(2) is not applicable to this arrangement. In fact, if the

6    court were to consider this arrangement to be an insurance policy, it would defy the purpose of the

7    statutory scheme by giving an unjustified windfall to defendants. If the existence of the shared-loss

8    agreement was held to reduce defendants' liability, defendants would be free from their burden of

9    repayment while the FDIC would be left to bear most of the cost of the defendants' breach. Such a

10   result would be antithetical to the purpose of the statutory scheme.

11         Therefore, in order to prevent an unjustified windfall to the defendants, and because there

12   is no possibility of double-recovery by the plaintiff, the court finds that the shared-loss agreement

13   is categorically different from an "insurance policy" contemplated within § 40.459(2). Therefore the

14   court finds that the compensation given to the plaintiff by the FDIC could not serve to limit

15   plaintiff's recovery, and that defendants' argument raises no genuine issue of material fact.

16   *(E) Recoupment*

17         Defendants argue that their recoupment defenses raise genuine issues of material fact.

18   "Recoupment is a right of the defendant to have a deduction from the amount of the plaintiff's

19   damages, for the reason that the plaintiff has not complied with the cross obligations or independent

20   covenants arising under the same contract." *Schettler v. RalRon Capital Corp.*, 275 P.3d 933, 941

21   (Nev. 2012) (internal quotations omitted). Specifically, defendants claim that plaintiff "reduced the

22   initial loan amount, reduced the interest reserves, limited the scope of development, and reduced the

23   principal amount of the [l]oan." (Doc. # 112, 27:11-14) Defendants argue that these actions

24   constituted an anticipatory breach of the loan agreement, and that they are thereby excused from

25   performance under their guaranty agreements. Defendants also argue that plaintiff breached a duty

26   by foreclosing upon the property while the market was in decline.

27   . . .

28

**James C. Mahan**
**U.S. District Judge**

- 10 -

What defendants fail to mention about the alleged "anticipatory breaches," is that they were actually performed in accordance with a modification of the original loan agreement that they consented to. This amendment to the loan agreement, among other things, reduced the amount committed under the loan to $19,885,000.00, and was performed *at the request of Station Plaza.* (Doc. # 107- 4, 56). This amendment also bears the signature of each of the defendants. (Doc. # 107-4, 57-62). Defendants do not allege that this amendment is invalid. Considering that plaintiff's action in reducing the initial loan amount adhered to the terms of the amendment to the loan agreement, defendants have not made a showing sufficient to establish that plaintiff anticipatorily breached the contract.

Defendants also argue that plaintiff "drove up the indebtedness amount" by waiting to foreclose "until the [p]roperty value was significantly reduced due to the market decline." (Doc # 112, 27:14-16). Notably, the statutory scheme does not burden creditors with the obligation of divining the future trends of the real estate market or require that foreclosures occur only when a property's value is at its peak. If a creditor did seek to delay a trustee's sale in anticipation of a market decline, he would do so at his own risk, as such a decision could just as likely lead to a loss if his market forecasts were incorrect.

The risks of market fluctuation are known both to lenders and borrowers when entering into agreements such as this one. In this case, it appears that the market conditions acted to plaintiff's benefit. Alternatively, if the market conditions had driven up the value of the property, defendants would be in a position to benefit and plaintiff would have no additional recourse. To reduce a deficiency judgment based on the value of a property under prior market conditions would effectively punish creditors for favorable macroeconomic fluctuations that are entirely out of their control. The court refuses to impose such a burden.

Additionally, § 40.457(1) is extremely specific that the relevant value is the "fair market value of the property sold *as of the date of the . . . trustee's sale.*" NEV. REV. STAT. § 40.457(1) (emphasis added). If it had desired to hold a creditor accountable for the price of the property prior to a market decline, the legislature could have easily included such a provision in the statute.

James C. Mahan
U.S. District Judge

- 11 -

1   Furthermore, defendants do not argue that the time line of the foreclosure violated any specific

2   requirement of the statutory scheme. Therefore, defendants' recoupment defense regarding the

3   timing of the foreclosure vis-à-vis the decline in the real estate market does not raise a genuine issue

4   of material fact.

5   **IV.    Conclusion**

6          For the foregoing reasons, the court finds that the undisputed evidence shows that the amount

7   of consideration plaintiff paid the FDIC to acquire the right to obtain the judgment was

8   $19,375,448.45. The court also finds that plaintiff has provided sufficient evidence to establish all

9   essential elements of its claim and that defendants' arguments relating to amount of indebtedness

10  and recoupment do not give rise to any genuine issues of material fact.

11         However, the court recognizes that it may not make a ruling regarding the fair market value

12  at the time of the trustee's sale prior to holding a hearing under NEV. REV. STAT. § 40.457(1). *Am.*

13  *Gen. Fin. Corp. v. First Commercial Title, Inc.*, 524 P.2d 1270, 1271 (1974). Therefore the court

14  shall grant plaintiff's motion for summary judgment except as to the issue of fair market value at the

15  time of sale. Accordingly, the court will deny defendants' motion for summary judgment.

16         In anticipation of this possible outcome, both parties have requested that a hearing take place

17  pursuant to NEV. REV. STAT. § 40.457(1). The court will grant these requests. Though NEV. REV.

18  STAT. § 40.457(2) allows the court to appoint an appraiser, the court is within its discretion to

19  decline to do so and instead require the parties themselves to submit sufficient evidence on the issue.

20  *See Unruh v. Streight*, 615 P.2d 247, 249 (1980). The court declines to appoint an appraiser at this

21  time.

22         IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment (doc. # 107)

23  is GRANTED as to all issues except the fair market value of the property at the time of the trustee's

24  sale.

25         IT IS FURTHER ORDERED that defendants' motion for summary judgment (doc. # 106)

26  is DENIED.

27         IT IS FURTHER ORDERED that the parties shall have thirty (30) days from entry of this

28

**James C. Mahan**
**U.S. District Judge**

- 12 -

1  order to file opening briefs of not more than fifteen (15) pages concerning the fair market value of

2  the property at issue at the time of the trustee's sale. The parties shall then have ten (10) days after

3  the filing of opening briefs to file response briefs of not more than ten (10) pages. Thereafter, the

4  court shall set a fair market valuation hearing pursuant to NEV. REV. STAT. § 40.457(1).

5       DATED September 26, 2013.

6

7  UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28