# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

BRANCH BANKING AND TRUST COMPANY,

    Plaintiff,

v.

DAVID M. FRANK, et al.,

    Defendants.

2:11-CV-1366 JCM (CWH)

## ORDER

Presently before the court is defendants' motion for the court to reconsider its order granting partial summary judgment in favor of plaintiff. (Doc. # 138). Plaintiff filed a response in opposition (doc. # 143), and defendants filed a reply (doc. # 147).

**I.    Background**

This case arises out of a loan transaction which occurred on or about April 19, 2005 by and between Station Plaza Partners, LLC ("Station Plaza") and Colonial Bank, plaintiff's predecessor-in-interest.[1] Station Plaza requested $29,260,700.00 to purchase and develop approximately 20.16 acres of raw land near the intersection of Lake Mead Blvd. and Rancho Drive in North Las Vegas, Nevada. A deed of trust was executed on the subject property to secure repayment. The loan was evidenced by a promissory note, and each of the defendants in this action individually guaranteed repayment.

---

[1] In August 2009, Colonial Bank failed and was taken over by the Financial Institutions Division of the State of Nevada Department of Business and Industry. The FDIC was appointed as the receiver for Colonial Bank and, on August 14, 2009, plaintiff purchased most of Colonial Bank's assets, including the subject loan, from the FDIC.

**James C. Mahan**
**U.S. District Judge**

On or about August 19, 2008, with the consent of Colonial Bank, Station Plaza, and defendants, the maximum amount committed under the loan was reduced to $19,885,000.00. On July 23, 2009, Station Plaza defaulted on the loan. As a result, on June 22, 2011, plaintiff declared the entire balance due in accordance with the terms of the loan.

Plaintiff initiated this action on August 24, 2011, after neither Station Plaza nor any of the defendants attempted to pay the balance of the loan. On March 23, 2012, a trustee's sale of the property occurred in which plaintiff acquired the property by placing a credit bid of $7.6 million.

On January 22, 2013, plaintiff and defendants each filed motions for summary judgment. (Docs. # 106 & 107). In their motion, defendants argued that they were entitled to judgment as a matter of law because plaintiff had not provided sufficient evidence regarding *inter alia* (1) the fair market value of the property at the time of the trustee's sale and (2) the amount of consideration paid to acquire the loan, both of which are required under Nev. Rev. Stat. § 40.459(1). In its own motion, plaintiff argued that it was entitled to judgment in its favor, as it had provided sufficient evidence regarding all essential elements of its claim and defendants did not present evidence which raised any genuine issues of material fact.

On September 26, 2013, the court granted plaintiff's motion for summary judgment as to all issues except as to the fair market value of the property at the time of the trustee's sale. The court reserved judgment on this final matter as the Nevada statutory scheme specifically requires that the court hold a hearing on the issue before awarding a deficiency judgment. *See* Nev. Rev. Stat. § 40.457(1). On the issues of fair market value and consideration, the court found that the credit bid constituted prima facie evidence of the property's value at the time of the trustee's sale and that deposition testimony and documentary evidence presented by plaintiff was sufficient to establish the consideration paid by plaintiff for the right to obtain a judgment on the loan. The court also found that the "loss-sharing agreement" between plaintiff and the FDIC would not reduce the "amount of indebtedness" considered when determining the value of a deficiency judgment.

**II.    Legal Standard**

A motion for reconsideration "should not be granted, absent highly unusual circumstances."

James C. Mahan
U.S. District Judge

- 2 -

*Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Reconsideration "is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Rule 59(e) "permits a district court to reconsider and amend a previous order," however "the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotations omitted). "A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised in the earlier litigation." *Id.* (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 887, 890 (9th Cir. 2000)).

**III. Nevada Statutory Scheme**

Under Nevada law, following a trustee's sale, a creditor is entitled to a deficiency judgment "if it appears from the sheriff's return or the recital of consideration in the trustee's deed that there is a deficiency of the proceeds of the sale and a balance remaining due to the judgment creditor or the beneficiary of the deed of trust, respectively." Nev. Rev. Stat. § 40.455(1). This statutory scheme also requires that the court, prior to awarding a deficiency judgment, hold a hearing regarding the fair market value of the property as of the date of the trustee's sale. Nev Rev. Stat. § 40.457(1).

The statute provides that the amount of a resulting deficiency judgment be no more than:

> (a) The amount by which the amount of the indebtedness which was secured exceeds the fair market value of the property sold at the time of the sale, with interest from the date of the sale;
>
> (b) The amount which is the difference between the amount for which the property was actually sold and the amount of the indebtedness which was secured, with interest from the date of sale; or
>
> (c) If the person seeking the judgment acquired the right to obtain the judgment from a person who previously held that right, the amount by which the amount of the consideration paid for that right exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater, with interest from the date of sale and reasonable costs, whichever is the lesser amount.

James C. Mahan
U.S. District Judge

Nev. Rev. Stat. § 40.459(1). Additionally, the statute provides that the "amount of indebtedness" referred to in 40.459(1)(a) "does not include any amount received by, or payable to, the judgment creditor or beneficiary of the deed of trust pursuant to an insurance policy to compensate the judgment creditor or beneficiary for any losses incurred with respect to the property or default on the debt." Nev. Rev. Stat. § 40.459(2).

## IV. Discussion

Defendants request that the court reconsider its order pursuant to Federal Rule of Civil Procedure 59(e). In their motion, defendants put forward four separate grounds which they argue warrant reconsideration of the court's order granting partial summary judgment. Defendants double down on their argument that plaintiff's credit bid cannot serve as substantial evidence of the property's fair market value. Additionally, defendants again question the sufficiency of plaintiff's consideration evidence, stating *inter alia* that "self-contradictions" in plaintiff's statements raise genuine issues of material fact. Defendants also claim that "newly discovered evidence," in the form of a 10Q form filed with the SEC in 2009, creates a genuine issue of material fact that would have prevented summary judgment if it had been timely disclosed. Finally, defendants now point to quotations from the legislative history of Nev. Rev. Stat. § 40.459(2) and argue that these statements indicate that the "amount of indebtedness" considered by the court should be reduced.

(a) Fair market value

In the instant motion, defendants rehash an argument that was examined thoroughly in the court's prior order, that plaintiff's credit bid does not constitute substantial evidence of the property's fair market value at the time of the trustee's sale. Defendants argue that the credit bid is not sufficient evidence because: (1) the trustee's sale did not have a willing seller and (2) the statutory scheme uses the terms "fair market value" and "sale price" separately. In addition, defendants argue (3) that plaintiff's testimony regarding the value of its own property cannot be considered by the court.

(1) "Willing seller" requirement

Defendants correctly observe that under Nevada law "[f]air market value is generally defined as the price which a purchaser, willing but not obliged to buy, would pay an owner willing but not

1  obliged to sell, taking into consideration all the uses to which the property is adapted and might in
2  reason be applied." *Unruh v. Streight*, 615 P.2d 247, 249 (Nev. 1980). Defendants claim that because
3  the present case lacks a willing seller, and instead involves property that was sold following a
4  foreclosure, that the sale price does not reflect the property's fair market value.

5        While defendants are correct that forced sales can result in property being sold at a price
6  below its fair market value, the court's order was not based upon a finding that *all* credit bids serve
7  as evidence of fair market value, only that, because plaintiff used an established, habitual process
8  of collecting independent appraisals within a set time span in order to develop its valuation of the
9  property, that *this particular* credit bid was sufficient to establish prima facie proof of the property's
10  fair market value. In cases such as this one, in which a property was not transferred by a willing
11  seller, the court is forced to turned to evidence reflecting what the fair market value would have been
12  if the sale had involved a willing buyer and willing seller freely negotiating the terms of sale. *See*
13  *Unruh*, 615 P.2d at 248-49.

14        In fact, reference to such evidence to determine fair market value is necessary in eminent
15  domain cases, where, by definition, there is no willing seller. *See State ex rel. Dep't of Highways v.*
16  *Campbell*, 388 P.2d 733, 737 (Nev. 1964). Because plaintiff provides substantial evidence to support
17  its claims regarding the property's fair market value, the fact that there was no willing seller in this
18  case is not material to the adequacy of plaintiff's evidence. *See Halfon v. Title Ins. & Trust Co.*, 634
19  P.2d 660, 661 (Nev. 1981).

20              (2) Distinction between "fair market value" and "the amount for which the property
21                  was actually sold"

22        Similarly, defendants argue that because Nev. Rev. Stat. § 40.591 separately uses the terms
23  "fair market value" and "the amount for which the property was actually sold," that the court erred
24  in finding that the credit bid constitutes prima facie evidence of the fair market value at the time of
25  the sale. Defendants correctly state that these phrases refer to separate and distinct factors, but
26  wrongly assume that their values are always different. In fact, the sale price of a property is strongly
27  correlated with its fair market value. In any case, the court did not hold and does not imply that a
28

1  property's fair market value is always identical to its sale price, only that plaintiff has met its burden
2  by providing substantial evidence of the fair market value through the process of reaching of its
3  credit bid *in this case*.

(3) A property owner's competence to testify to the value of his property

Defendants also contest that plaintiff is competent to testify regarding the property's fair market value. With this assertion, defendants fight against the tide of clear and longstanding Nevada authority holding that a property owner's testimony can be sufficient to prove a property's fair market value. *See State ex rel. Dep't of Highways v. Olsen*, 351 P.2d 186, 188-89 (Nev. 1960); *Campbell*, 388 P.2d at 737.[2] Defendants attempt to distinguish the present case from *Olsen*, correctly stating that property owner in that case had owned her property for ten years, whereas plaintiff's ownership of the property in this case began on the same day as the sale. *See Olsen*, 351 P.2d at 189.

However, Nevada precedent makes clear that the duration of ownership speaks to the *level of weight* the owner's testimony is to be given by the trier of fact, *not to whether the testimony is competent evidence in the first instance*. *Campbell*, 388 P.2d at 737. Because the court's role in the underlying motions was only to determine whether or not plaintiff had provided *sufficient* evidence to prove the property's fair market value, the duration of plaintiff's ownership would not have been an appropriate factor for consideration. Therefore, as plaintiff provided competent evidence as to the property's fair market value that was unrebutted by defendants, summary judgment on this matter was appropriate.[3]

---

[2] Defendants also argue that plaintiff's testimony cannot be considered by the court, claiming that it constitutes "triple hearsay." However, Nevada law makes clear that a property's owner is competent to testify as to its value even if his opinion is formed through hearsay. *Campbell*, 388 P.2d at 735-36 (holding a property owner's testimony regarding the value of his land was sufficient to prove its value, even though his opinion was based on the values of surrounding parcels which he gathered partially by "checking with the owners and the sellers and talking to them and through conversations with purchasers").

[3] Defendants also argue that plaintiff's perception of the value of the property is partially based upon appraisals made on August 24, 2011, February 7, 2012, and January 24, 2012 while the trustee's sale did not take place until March 23, 2012. While defendants correctly observe that Nev. Rev. Stat. § 40.459(1) requires evidence of the "fair market value of the property sold *at the time of sale*," the statute does not burden plaintiff with the obligation to present evidence of fair market value at the precise microsecond the sale took place. On the contrary, because plaintiff only need provide competent evidence, and a reasonable person would conclude that an appraisal conducted within a few months of a sale would be adequate to determine a property's value, these appraisals provide an acceptable basis for plaintiff's knowledge of the property's value on the date of the trustee's sale.

James C. Mahan
U.S. District Judge

- 6 -

        (b) Consideration Paid for the Loan

        (1) "Self-contradictions" in plaintiff's testimony

Defendants claim that "contradictions" between the testimony of Brent Hicks and plaintiff's answer to an interrogatory raise a genuine issue of material fact as to the amount of consideration paid for the loan. Plaintiff explains that these seeming discrepancies actually occurred only because of an initial lack of information that was later remedied by plaintiff.

As it stands, the court need not consider this newly raised argument at this stage in the litigation. Defendants' arguments on the original motions claimed only that the evidence presented by plaintiff was insufficient to prove the amount of consideration paid, not that inconsistencies in plaintiff's answers cast doubt on the veracity of its evidence. (*See* doc # 112 pp. 16-21). Because defendants did not raise this argument prior to the court's decision on the underlying motions for summary judgment, the argument is waived and need not be considered at this stage.

Furthermore, even if it was appropriate to consider defendants' argument at this time, the "contradiction" presented by defendants is not a contradiction at all. Initially, plaintiff responded to defendants' interrogatory regarding consideration by stating that the information was "nondiscoverable" or "irrelevant." (Doc. # 138 p. 6:1-3). Subsequently, the court issued an order allowing discovery on the issue of consideration, and plaintiff then responded that it "[could] not show the individual amount of consideration it paid for the right to enforce each individual guaranty or loan obligation . . . ." (Doc. # 138 p. 6:5-9). Plaintiff later supplemented this response through the deposition of its corporate designee, Brent Hicks. Mr. Hicks, after referencing the newly prepared schedule 4.15(b) form, was able to testify that the consideration paid was "$19,375,448.45." (Doc. #138 p. 6:16-19).

Despite defendants' adamant arguments to the contrary, plaintiff's precise calculation of the consideration paid for the loan did not contradict its previous response that it could not, at that point, state the amount that was specifically paid for any individual loan it acquired from Colonial Bank. The discrepancy in answers is entirely explained by the fact that plaintiff gained additional clarity through the calculations it performed and data it obtained while discovery was ongoing.

**James C. Mahan**
**U.S. District Judge**

- 7 -

The record does not show that plaintiff, at any point, presented any varying calculations of the amount that it paid for this loan, only that at one point there was difficulty calculating the precise value of this individual loan due to the structure of its transaction with the FDIC. As a result, the court does not find that the alleged "contradictions" pointed to by defendants raise any genuine issues of material fact that would have altered the courts decision regarding summary judgment.

(2) Sufficiency of plaintiff's consideration evidence

Defendants also argue that plaintiff's argument relating to consideration was insufficient because plaintiff never specifically produced documents evidencing wire transfers that took place between plaintiff and the FDIC. Under defendants' interpretation of Nev. Rev. Stat. § 40.459(c) then, it is not enough for a creditor to show that it has taken on an obligation to pay a designated amount in exchange for receiving the rights to a loan. Indeed, defendants indicate that the only way a purchaser of a loan can prove the amount of consideration paid is by providing documentation evidencing that it has transferred every promised cent into the account of the prior holder. While such evidence would certainly be sufficient to prove the amount of consideration paid, Nev. Rev. Stat. § 40.459(c) certainly does not impose such a severe evidentiary requirement.

Defendants forget that Nevada law only requires that plaintiff provide "substantial evidence" to support a calculation of damages. *See, e.g.*, *Cathcart v. Robison, Lyle, Belaustegui, & Robb*, 795 P.2d 986, 987 (Nev. 1990). Nevada law defines "substantial evidence" as "evidence that a reasonable mind might accept as adequate to support a conclusion." *First Interstate Bank of Nevada v. Jafbros Auto Body, Inc.*, 787 P.2d 765, 767 (Nev. 1990). As detailed in the court's prior order, the testimony of Mr. Hicks as well as the schedule 4.15(b) by themselves provide enough evidence from which a reasonable person could conclude that plaintiff agreed to pay the amount of $19,375,448.45 as consideration for the loan. While additional evidence of wire transfers between plaintiff and the FDIC may further solidify this conclusion, it is certainly not required under the substantial evidence standard.

It is possible that defendants' interpretation of the Nev. Rev. Stat. § 40.459's requirements comes from a misunderstanding of what is meant by the term "consideration." Consideration need

James C. Mahan
U.S. District Judge

- 8 -

not be a direct transfer of a monetary sum, but in fact "consideration may be a benefit to the promisor or a loss or detriment to the promisee. It may take the form of a right, interest, or profit accruing to one party, or some forbearance, detriment, or responsibility given, suffered, or undertaken by the other. It may also consist of the creation, modification, or destruction of a legal relation." 417A Am. Jur. 2d Contracts 102.

In this case, plaintiff's binding promise to pay the amount of $19,375,448.45 to the FDIC constituted consideration even before that amount was transferred to the FDIC. Because of this, plaintiff need not provide evidence of the wire transfers in order to demonstrate that consideration was paid for the right to obtain a judgment on the loan. Therefore the evidence provided by plaintiff was sufficient to support summary judgment on the issue of consideration.

Defendants claim that they suffered prejudice due to the fact that Mr. Hicks' testimony and the schedule 4.15(b) were produced after the close of discovery. Defendants assert that rule 26(e) requires that this evidence be disregarded due to its late production. As discussed in the prior order, the deposition of Mr. Hicks took place more than two months after the close of discovery *by the agreement of all of the parties in the case*. At the deposition, the 4.15(b) schedule was shown to defendants, who took the opportunity to extensively question Mr. Hicks about its contents. Insofar as plaintiff had an obligation to supplement its prior interrogatory responses with new information it obtained, it did so through the production of the schedule 4.15(b) and the testimony of Mr. Hicks at the deposition.

If defendants had feared they would suffer prejudice by having Mr. Hicks give testimony after the close of discovery, they should not have agreed to hold the deposition at that late date. As it stands, defendants affirmatively consented to holding the deposition after the discovery deadline and were able to question Mr. Hicks about the evidence at that time. Because of this, the court declines to alter its finding that the Hicks testimony and the production of the schedule 4.15(b) after the close of discovery were both substantially justified and harmless.

(3) "Newly-discovered" evidence

Defendants finally argue that a "newly discovered" 10Q form raises a genuine issue of

**James C. Mahan**
**U.S. District Judge**

material fact as to the issue of consideration. This 10Q form was presented to defendants in May 2013 after the briefing was completed on the motions for summary judgment. This document was filed with the SEC by plaintiff in 2009, and had been publicly available since that time. In relevant part, this document states that the total value of the loans acquired, as recorded by Colonial Bank, was $14.328 billion, that there was a "fair value adjustment" reducing this value by $4.692 billion, leading to an adjusted value, as recorded by plaintiff, of $9.636 billion. (Doc. # 138-2 p. 11).

For a motion to reconsider an order of summary judgment on the basis of newly discovered evidence to be successful, "[I] the evidence must be 'newly discovered,' and not in the moving party's possession at the time of trial, [ii] the moving party must have exercised reasonable diligence prior to the time of trial to discover the evidence, and [iii] the newly discovered evidence must be of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Albuquerque v. Arizona Indoor Soccer, Inc.*, 880 F.2d 416 (9th Cir. 1989) (internal citations omitted). Because none of these criteria are met in this case, defendants fail to show that reconsideration should be granted on the basis of this "newly discovered evidence."

(I) Possession at the time of trial

The first criterion for reconsideration on the basis of newly discovered evidence requires that the evidence in question was not in the moving party's possession at the time of "trial." *Id.* In cases, such as this one, involving an order granting summary judgment, it is required that the movant not have had possession of the evidence prior to a hearing on the motion for summary judgment. *See Engelhard Indus., Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir. 1963). In the instant case, there was no hearing held regarding the underlying motions for summary judgment. As a result, the relevant consideration becomes whether the moving party possessed the evidence prior to the court's disposition on the motion for summary judgment. As defendants admittedly possessed this evidence four months prior to the court issuing its order upon these motions, the 10Q form cannot be considered "newly discovered."

When a new issue or piece of evidence arises after briefing on a motion has been completed, a party has the ability to request leave to file a sur-reply or a supplement which would bring the

James C. Mahan
U.S. District Judge

- 10 -

1  matter to the attention of the court. In this case, though they admittedly possessed the 10Q form in
2  May, 2013, defendants decided not to bring it to the court's attention at any time prior to the court's
3  order granting partial summary judgment in favor of plaintiff on September 26, 2013.

4  By choosing not to request leave to file a sur-reply or a supplement in the four months prior
5  to the court's decision, defendants relinquished their ability to have the 10Q form considered in
6  regard to the motions for summary judgment. It would contradict every notion of judicial economy
7  to allow a party to present long-available evidence the instant an adverse ruling has been made. As
8  such, the court finds that the 10Q form cannot be considered "newly discovered."

9                 (ii) Reasonable diligence

10  Even if the 10Q form had been discovered subsequent to the court's order granting summary
11  judgment, defendants fail to show that they could not have found this form if they had exercised
12  reasonable diligence. The court will not reconsider an order on the basis of newly discovered
13  evidence if the evidence "could have been discovered with reasonable diligence." *Coastal Transfer*
14  *Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 212 (9th Cir. 1987).

15  Defendants assert that they exercised reasonable diligence by pursuing discovery relating to
16  the amount of consideration and relying on plaintiff's interrogatory response that the consideration
17  paid for the rights to this individual loan could not be calculated. However, because the 10Q form
18  was a publicly available document filed more than three years prior to the motions for summary
19  judgment, and because the interrogatory "relied on" by defendants pertained to a question that was
20  entirely separate from the information presented in the 10Q form, the court finds that defendants
21  failed to exercise reasonable diligence to discover this evidence.

22  First of all, the fact that the 10Q form is a publicly available document filed with the SEC
23  in 2009 belies defendants' claim that it could not be found with reasonable diligence. In fact, by
24  simply going to the SEC's web site and typing the phrase "BB&T Corporation" into a search box,
25  any ten-year-old with an internet connection can browse plaintiff's filings with the SEC dating all
26  the way back to February 1994. Conveniently, these filings are organized chronologically, making
27  it very easy to locate the filings that contain information about transactions which took place around
28

James C. Mahan
U.S. District Judge

- 11 -

the time that plaintiff acquired the Colonial Bank assets.

Far from an arduous voyage to locate the city of Atlantis, one can find the web site containing the elusive SEC filing within minutes of commencing an internet search.[4] Possibly the most puzzling enigma regarding this document is how defendants managed to remain unaware of its existence for as long as they did. Regardless of the answer to that mystery, it is clear that if reasonable diligence had truly been exercised, this document would have been discovered far earlier.

Defendants additionally insist that they did not discover the 10Q form because they relied upon plaintiff's supplemental answer to their fourth interrogatory. (Doc. # 138 p. 17:14-16). This interrogatory, in full, requested that plaintiff: "Identify and explain the amount of Consideration [it] paid to FDIC for the Acquisition of the Rights to enforce any Obligation under the Loan and Guaranties." (Doc. # 138-8 p. 3:20-22). Plaintiff's supplemental response detailed the knowledge plaintiff held at the time about the structure of the transaction with the FDIC, and stated that due to the large volume of assets and unique character of the transaction, plaintiff was not able to convey the amount of consideration paid for the individual loan at issue in this case. (*See* doc. # 138-8 pp. 3:25-4:14).

Notably, plaintiff's response did not state that it would have any difficulty conveying the amount it paid in consideration for *all* of the assets of Colonial Bank; instead, the response only referred to the difficulty inherent in calculating the consideration for *the single loan at issue in this case*. Defendants' claim, that their reliance on this interrogatory response could have prevented them from finding the 10Q form, is incongruous. The 10Q form did not contain information about the individual loan at issue in this case, but instead contained information regarding plaintiff's entire transaction with the FDIC.

The information that is contained in the 10Q form is the precise type of information that plaintiff indicated was available through its incredibly detailed supplemental response to the interrogatory. By analogy then, defendants contend that they relied on a statement claiming that plaintiff had many apples but no oranges to conclude that plaintiff had no apples. Such reliance was

---

[4] http://www.sec.gov/Archives/edgar/data/92230/000119312509229012/d10q.htm

clearly not warranted, and defendants' assertion of "reliance" merely serves to indicate that they did not exercise reasonable diligence to discover the 10Q form.

### (iii) Magnitude of the evidence

Finally, even if defendants had referred to the 10Q form in their response to plaintiff's motion for summary judgment, there would have been no change in the outcome. Defendants argue that the 10Q form indicates that plaintiff bought the Colonial Bank assets at a discount because one of the columns contains downward "fair value adjustments" to the estimated value of the assets. (Doc. # 138-2 p. 11). This assertion, however, is based upon a misinterpretation of the document's contents. In fact, this portion of the 10Q form, rather than revealing information regarding payments from plaintiff to the FDIC, instead pertains exclusively to the *fair value* of the assets that were formerly owned by Colonial Bank.

By its own terms, the document merely notes the value as recorded by Colonial Bank, presents aggregated downward adjustment of the fair market value of the loans, and concludes with plaintiff's estimated value of the assets. Because the document does not even claim to involve a monetary sum given to the FDIC to obtain the loans, this document certainly cannot serve as "evidence that a reasonable mind might accept as adequate to support" the conclusion that plaintiff received the pool of loans at a discount. Therefore, even if this evidence had been presented for the court's consideration along with the motions for summary judgment, it would not have made any difference in the disposition of this case.

Therefore, because the 10Q form: (1) was in plaintiff's possession prior to the court's order granting partial summary judgment; (2) was an easily accessible, publicly available SEC filing that defendants could have obtained if they had exercised reasonable diligence; and (3) would not have raised a genuine issue of material fact even if it had been submitted for the court's consideration prior to its order regarding the motions for summary judgment, defendants' argument regarding "newly discovered evidence" does not warrant reconsideration of the court's order.

### (c) Amount of indebtedness

Finally, defendants argue that the court erred in the way it applied the statutory requirements

of Nev. Rev. Stat. § 40.459(2) which regards the "amount of indebtedness." This provision limits the amount a creditor can recover in a deficiency judgment by providing that "the 'amount of the indebtedness' does not include any amount received by, or payable to, the judgment creditor or beneficiary of the deed of trust pursuant to an insurance policy to compensate the judgment creditor or beneficiary for any losses incurred with respect to the property or the default on the debt." Nev. Rev. Stat. § 40.459(2).

In its order, the court stated that the loss-sharing agreement between plaintiff and the FDIC does not qualify as an "insurance policy" under this provision, citing that the legislative intent behind the statutory scheme is to prevent lenders from receiving a double-recovery following a default. Under the loss-sharing agreement, plaintiff will be compensated by the FDIC for 80% of the amount that it cannot collect on loans in default after *it has exercised its best efforts to do so*.

However, plaintiff is prevented from recovering more than is owed under these loans because plaintiff is obligated to refund the FDIC if it subsequently recovers all or part of the outstanding balance on the loans. Because the loss-sharing agreement, by its own terms, prevents plaintiff from recovering more than it is entitled to under the loan, the court reasoned that this agreement did not qualify as an "insurance policy" within the meaning of Nev. Rev. Stat. § 40.459(2).

Defendants now contend that the loss-sharing agreement is the exact type of arrangement the Nevada legislature had in mind when it passed Nev. Rev. Stat § 40.459(2), and that the court erred by ruling that this agreement would not reduce the "amount of indebtedness" factored into the value of a deficiency judgment. In support of this argument, defendants cite to a statement by Assemblyman Marcus Conklin, the bill's sponsor, which makes a reference to "insurance" the FDIC has provided to entities that purchase loans from failed banks. (Doc. # 138-14 p. 4). In relevant part, Assemblyman Conklin stated:

> The Federal Deposit Insurance Corporation (FDIC) has insured the new banks. They said that for any loan that the previous bank secured for the purchase of a house, they would insure against loss for the new bank so they would not be assuming all the risk of the purchase. That insurance is upwards of 80 percent of any loss. A lot of homes were purchased with private mortgage insurance (PMI),

> which covers the borrower in the case where he cannot make his mortgage payments; if the home is repossessed by the bank, the deficiency between the value of the home and the balance of the loan is covered by the PMI.
>
> We are trying to establish in [the] statute that those insurance instruments must be exercised first, before the amount of the deficiency is determined in a court action, thereby minimizing the potential deficiency for which a borrower can be sued. The insurance instruments have to be collected first. The insurance companies have been shored up for this purpose, sometimes through American Recovery and Reinvestment Act of 2009 (ARRA) funds. I do not want to suggest there is factual evidence that it is not being done. The problem is that the law is not perfectly clear that it cannot be done. There are ways that a court can file against the loan without going to foreclosure, thereby skipping the deficiency part. This makes it clear to the court that all instruments must be exercised before determining the final deficiency between the borrowed amount and the asset amount collected back by the bank. We are attempting to prevent a lender from profiting from a judgment.

*See* Minutes of the Nev. Assemb. Comm. on Commerce and Labor, 76th Sess., at 4-5 (March 23, 2011) (discussing Assembly Bill 273 which was later incorporated into the Nevada Revised Statutes as Nev. Rev. Stat § 40.459(2)).

Though it does make reference to arrangements between private banks and the FDIC, this single statement from the author of the legislation made solely in front of the committee on commerce and labor merely reaffirms the conclusion made in the court's prior order. It is telling that Assemblyman Conklin ended his analysis by clarifying that this provision was intended to "prevent a lender from profiting from a judgment." This statement makes clear that the loss-sharing agreement in this case does not fall within the purview of Nev. Rev. Stat. § 40.459(2), because under the agreement, plaintiff must return payments to the FDIC if plaintiff is later able to collect upon an underlying loan.

Therefore, any "profit" plaintiff received based on this loan would have to be refunded to the FDIC, creating no possibility for plaintiff to recover a sum greater than that which is outstanding under the loan. For this reason, the loss-sharing agreement does not qualify as an "insurance policy" under Nev. Rev. Stat. § 40.459(2), and it would not be appropriate to reduce the amount of indebtedness factored into a deficiency judgment in this case.

**James C. Mahan**
**U.S. District Judge**

- 15 -

1   However, even if it was the intent of the Nevada legislature to reduce the amount of
2   indebtedness based on provisions like the loss-sharing agreement, such an application of Nev. Rev.
3   Stat. § 40.459(2) would be barred under the doctrine of pre-emption. Rooted in the Supremacy
4   Clause of the United States Constitution, this doctrine requires that state laws not be given effect
5   when, "under the circumstances of the particular case, [the state law] stands as an obstacle to the
6   accomplishment and execution of the full purposes and objectives of Congress." *Geier v. Am. Honda*
7   *Motor Co., Inc.*, 529 U.S. 861, 873 (2000); *see also Wyeth v. Levine*, 555 U.S. 555, 563 (2009). In
8   this case, reducing the amount plaintiff can collect upon the loan based upon the loss-sharing
9   agreement would present an obstacle to the FDIC's efficient disposition of assets from a failed bank,
10  clearly contravening the objectives of the Federal Deposit Insurance Act.

11  With 12 U.S.C. §§ 1811(a) and (b), Congress established the FDIC to oversee the deposits
12  of all insured banks and created a specific division to oversee the liquidation and disposition of
13  assets of these institutions. Congress gave the FDIC the power to oversee the liquidation of the assets
14  of a failed bank in 12 U.S.C. § 1821(d)(2)(E) which states: "The [FDIC] may . . . as receiver, place
15  the insured depository institution in liquidation and proceed to realize upon the assets of the
16  institution." Additionally, Congress expressly established its intent for the FDIC not to be subject
17  to limitations imposed by states when acting in its capacity as a receiver of a failed bank: "When
18  acting as conservator or receiver. . . the [FDIC] shall not be subject to the direction or supervision
19  of any other agency or department of the United States *or any State* in the exercise of its rights,
20  powers, and privileges." 12 U.S.C. § 1821 (c)(3)(C) (emphasis added).

21  In this case, reducing the amount of indebtedness owed by defendants would interfere with
22  the FDIC's role as the receiver of Colonial Bank. In determining the most efficient and effective
23  method to maximize the amount it could recover from the assets of Colonial Bank, the FDIC agreed
24  to transfer Colonial Bank's assets to plaintiff in exchange for a substantial monetary sum. Through
25  this bargaining process, the FDIC was likely able to obtain a greater sum from plaintiff by agreeing
26  to bear some of the risk of the loss incurred due to the inability to collect some of the debt owed to
27  Colonial Bank. The fact that the agreement requires plaintiff to exercise its best efforts to collect
28

James C. Mahan
U.S. District Judge

- 16 -

1  upon the loans before it can be reimbursed by the FDIC differentiates this from an arrangement in
2  which the FDIC would have to simply pay 80% of the outstanding amount for all the loans in default.

3        The terms of this agreement, then, would be thrown completely askew if the court were to
4  reduce the value of a deficiency judgment based on the loss-sharing agreement. Such an action would
5  have the consequence of forcing the FDIC to pay 80% of the outstanding amount on this loan rather
6  than having defendants bear the burden of their own default. This result would contradict not only
7  the clear intent of Congress, which specifically exempted the FDIC's actions as a receiver from state
8  regulations, but also basic notions of fairness and justice. Because it was defendants who willingly
9  agreed to the loan's terms and it was defendants who defaulted on their obligation to pay, defendants
10 should not be able to pass the burden onto the FDIC. Indeed, since defendants had the ability to
11 avoid the loss in the first place, efficiency dictates that defendants should bear the cost of their own
12 choices.

13       As such, because there is no chance that the loss-sharing agreement will allow plaintiff to
14 recover more than the amount to which it is entitled under the loan, the provision relating to
15 "insurance agreements" within Nev. Rev. Stat. § 40.459(2) does not apply in this instance.
16 Furthermore, even if the Nevada legislature intended for that provision to apply to terms such as the
17 loss-sharing agreement, its application would be barred under the doctrine of pre-emption, as it
18 would serve as an obstacle to the intent of Congress expressed in the laws governing the FDIC. For
19 these reasons, the amount of indebtedness will not be reduced due to the loss-sharing agreement
20 between plaintiff and the FDIC.

21 **IV. Conclusion**

22       For the foregoing reasons, the court finds that defendants' motion for reconsideration does
23 not present any newly discovered evidence, indicate that the court's prior order came as a result of
24 clear error or manifest injustice, or reveal that there was a change in the controlling law.
25 Accordingly, the court will deny the motion.

26       IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants' motion for
27 reconsideration and to alter or amend judgment (doc. # 138) be, and the same hereby is, DENIED.

28

**James C. Mahan**
**U.S. District Judge**

- 17 -

IT IS FURTHER ORDERED that the parties are to appear for hearing and oral argument regarding the fair market value of the property at the time of the trustee's sale. This hearing will take place on Friday, January 24, 2014, at 10:00 a.m.

DATED December 17, 2013.

_____
**UNITED STATES DISTRICT JUDGE**

**James C. Mahan**
**U.S. District Judge**

- 18 -